1  Andrew J. Gramajo, CA # 338144
2  AJG LAW GROUP, PC.
   25A Crescent Dr. #402
3  Pleasant Hill, CA 94523
4  T:(415) 638-9140
   E: Andrew@Ajglawgroup.us
5
6  *Attorneys for Plaintiff*
   *Joseph Albert Lujan*
7

8            **IN THE UNITED STATES DISTRICT COURT**
         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
9                     **EASTERN DIVISION**

10

11 JOSEPH ALBERT LUJAN,              Case No.:

12              Plaintiff,

13 vs.                               **JURY TRAIL DEMANDED**

14
   LEXISNEXIS RISK SOLUTIONS         **1.  FCRA, 15 U.S.C. §§ 1681, et. seq.**
15 INC.,                            **2.  Cal. Civ. Code § 1785 et seq.**

16
              Defendant.
17

18

19                      **<u>COMPLAINT</u>**

20      Joseph Albert Lujan ("Plaintiff") a living, breathing 47-year-old consumer,

21
   brings this action on an individual basis, against LexisNexis Risk Solutions Inc.
22
23 ("LexisNexis" or "Defendant") for actual, statutory, and punitive damages and costs,

24 and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15

25 U.S.C. § 1681, *et. seq.*, and California Consumer Credit Reporting Agencies Act

26
   ("CCRAA"), Cal. Civ. Code § 1785, *et. seq.* and states as follows:
27

28
                              1
                                   COMPLAINT AND JURY TRIAL
                                             DEMAND

1

2

3

# **INTRODUCTION**

1.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties),

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.    One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his

3

knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)] (emphasis added).

8.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and

COMPLAINT AND JURY TRIAL DEMAND

modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.    Plaintiff's claims arise out of Defendant's blatantly inaccurate reporting, wherein Defendant reported to Plaintiff's potential creditors that he is "deceased."

12.    Defendant communicated to one or more third parties that Plaintiff's name, date of birth, address and social security number were associated with that of a deceased person.

13.    Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b) and Cal. Civ. Code § 1785.14.

14.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., and Cal. Civ. Code § 1785.14. as described herein.

## **PARTIES**

15.    Joseph Albert Lujan ("Plaintiff") is a natural person residing in Chino Hills, California, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c) and Cal Civ. Code § 1785.3(b).

16.    Defendant LexisNexis Risk Solutions, Inc. ("Defendant" or "LexisNexis") is a Delaware corporation doing business throughout the United

5

States, including the State of California and in this District, and has a principal place of business located at 1000 Alderman Drive, Alpharetta, Georgia 30005. LexisNexis can be served at its registered agent, C T Corporation System, located at 289 S Culver St, Lawrenceville, GA, 30046-4805.

17.    LexisNexis is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). LexisNexis is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

20.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

6

COMPLAINT AND JURY TRIAL DEMAND

21.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

22.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  *See* 15 U.S.C. § 1681(b).

23.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

24.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

COMPLAINT AND JURY TRIAL DEMAND

**Defendant's Practices Concerning the Sale of Reports on the "Deceased"**

25.     Defendant sells millions of consumer reports (often called "credit reports" or "reports") per day.

26.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like Defendant, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

27.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like Defendant, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

28.     Defendant routinely places a "deceased" notation or marking on reports when it is advised by any of its many data sources that a given consumer is deceased.

29.      Defendant does not request or require a death certificate from any of its data sources which advise that a consumer is "deceased" before placing a "deceased" mark in that consumer's credit file.

30.     Defendant does not request or require any proof from any data source which advises that a consumer is "deceased," showing that the consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

31.     Defendant does not independently verify with any source that a consumer is in fact deceased before placing a "deceased" mark on that consumer's report.

COMPLAINT AND JURY TRIAL
DEMAND

32.    In some cases, in order to assure accuracy, Defendant may send letters and/or other communications to consumers when certain information that may be considered suspicious or unreliable is furnished about said consumers to be placed in their credit files, such as in cases where consumers have a freeze or fraud alert on their credit report, or in accordance with certain state laws, such as the consumer laws of Colorado. Defendant does not have any procedure to notify consumers (such as a next of kin or executor or administrator of the consumer's estate) when Defendant has received information suggesting the consumer is deceased before adding that information to the consumer's credit file or report.

33.    The Social Security Administration (SSA) maintains the **Death Master File ("DMF")**.  The DMF is also known commercially as the Social Security Death Index (SSDI).  The SSA's DMF as of 2018 contained information on 111 million deaths that have been reported to the SSA.  The DMF is created from internal SSA records of deceased persons possessing social security numbers and whose deaths were reported to the SSA.  The DMF includes the following information on each decedent, if the data are available to the SSA: social security number, name, date of birth, and date of death.

34.    Legislation (i.e., the Social Security Act) precludes the sharing of the full DMF with non-benefits paying agencies.

35.    Because of the wide use and demand for death records for a variety of industries, SSA has partnered with the U.S. Department of Commerce's National

COMPLAINT AND JURY TRIAL DEMAND

Technical Information Service (NTIS) to release the **Limited Access Death Master File (LADMF)** electronically on a weekly and monthly basis.

36.    The SSA receives death reports from many sources, including family members, funeral homes, financial institutions, postal authorities, state information, and other federal agencies.  The SSA does not have a death record for all persons; therefore, the SSA does not guarantee the veracity of the DMF.  The SSA does not guarantee 100% of the data.

37.    The SSA estimates that roughly 12,000 living people are added to the DMF annually, potentially due to clerical error. An erroneous listing can lead to not only a cessation of government benefits, but also the freezing of bank accounts, the inability to buy or rent property, and mistaken accusations of identity theft.[1] [2]

38.    The Office of the Inspector General called the error rate "very low," but noted that "SSA's erroneous death entries can lead to mistaken benefit terminations and cause severe financial hardship and distress to affected people…when errors like this occur, it can be a long and difficult process to resurrect your financial health.[3]

39.    Defendant does not have access to the full DMF from the SSA, but rather is a subscriber to the NTIS LADMF.

---

[1] *Aviva Dekornfeld (2018-06-20). "The Plight of the Living Dead". The Indicator from Planet Money (Podcast).*
[2] Bichell, Rae Ellen (2016-08-10). "Social Security Data Errors Can Turn People into the Living Dead". *National Public Radio*.
[3] "Cases of Mistaken Death Reports Low but Costly | Office of the Inspector General, SSA". *oig.ssa.gov*. 2016-03-24. Archived from the original on 2020-07-16.

COMPLAINT AND JURY TRIAL DEMAND

40.    Despite being a subscriber to the NTIS LADMF, Defendant does not cross-reference the information it has received suggesting a consumer is deceased with the LADMF in order to determine whether any given consumer reported as deceased via its source is also on the LADMF before selling a credit report about said consumer, or at any time.

41.    Defendant fails to employ reasonable procedures that assure that a consumer is actually deceased before placing the "deceased" mark on that consumer's report and selling that report for profit.

42.    Even in instances where other data on the face of the consumer's report indicates that he/she is not deceased, Defendant does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark in that consumer's file.

43.    Even in instances where the purportedly deceased consumer communicates directly with the Defendant, Defendant does not employ any procedures to assure that a consumer is in fact actually deceased before placing the "deceased" mark on that consumer's report.

44.    Defendant knows that living consumers are routinely turned down for credit specifically because they are reporting them as "deceased."

45.    Defendant has been put on notice for years through consumer disputes and lawsuits that living, breathing consumers are turned down for credit specifically because Defendant is inaccurately reporting them as "deceased."

11

COMPLAINT AND JURY TRIAL
DEMAND

46.    Defendant has received and documented many disputes from consumers complaining that Defendant had erroneously marked them as "deceased" on their credit reports.

47.    Defendant knows that thousands of consumers are erroneously marked as "deceased" on their credit reports.

48.    Nevertheless, Defendant does not employ any procedures to assure that a consumer is actually deceased before adding a "deceased" notation to that consumer credit reports.

49.    Defendant does not employ any procedures to limit or stop the furnishing of reports to third parties for consumers that they have marked as "deceased" under any circumstances.

50.    For years after a consumer's actual death, Defendant will continue to sell credit reports about that consumer.

51.    Defendant will only remove a deceased consumer's file from its respective credit reporting databases when it is no longer valuable to it—meaning that no one is continuing to purchase reports about that consumer.

52.    Defendant charges third parties a fee for reports with a mark that a consumer is deceased ("reports on the deceased") as they would for any other report.

53.    Defendant profits from the sale of reports on deceased consumers.

54.    Defendant knows that truly deceased consumers do not apply for credit.

COMPLAINT AND JURY TRIAL
DEMAND

55.    Defendant knows that the credit information and reports of truly deceased persons are used by criminals to commit identity theft or credit fraud. Indeed, identity theft using the personal identifying information of deceased consumers is known to Defendant to be a common and major source of identity theft.

56.    Defendant knows that identity theft and credit fraud are serious and widespread problems in our society.

57.    Defendant sells reports on supposedly deceased consumers to third parties in an automated fashion and without any specific or general certification that could reasonably explain a "permissible purpose" for purchasing or using a (supposedly) deceased consumer's credit history and/or report.

58.    For consumers who are deceased, there rarely, if ever, exists a permissible purpose under the FCRA for the Defendant to sell their credit reports, absent a court order.

59.    Defendant knows that such reports contain a vast amount of personal identifying and credit account information on the supposedly deceased consumer, information that can be used to commit identity theft or for other fraudulent purposes.

**Plaintiff Applied for a Capital One Credit Card December 2024**

60.    In or about December 2024, Plaintiff set out to establish a more robust credit profile, recognizing the value of an established and fortified credit history. Plaintiff further intended to secure a line of credit to establish a financial security net

13

to protect himself in the case of piling expenses that he does not have the funds to cover.

61.    Plaintiff reviewed varying credit card application options and encountered a desirable Capital One offer.

62.    Accordingly, on or about December 2, 2024, Plaintiff completed and submitted an application for credit with Capital One.

**Capital One Denies Plaintiff's Credit Card Application December 2024**

63.    Capital One ordered a consumer report about Plaintiff from Defendant on or about December 2, 2024.

64.    Defendant published information about Plaintiff to Capital One in response to that credit application, on or about December 2, 2024.

65.    Upon receipt and review of Defendant's report about Plaintiff, Capital One denied Plaintiff's credit card application.

66.    Specifically, Capital One denied Plaintiff's credit card application because Defendant reported that Plaintiff was deceased. This was communicated to Plaintiff on a Capital One denial letter dated to December 2, 2024.

67.    Capital One denied Plaintiff's credit card application based upon the contents of a consumer report Defendant sold about Plaintiff.

68.    Plaintiff was disappointed at the Capital One credit card denial. Certainly, Plaintiff was not deceased. Plaintiff found that information to be very distressing and confusing, even shocking.

COMPLAINT AND JURY TRIAL
DEMAND

**Plaintiff Obtains His Consumer Report and Confirms that Defendant Was Reporting Him as Deceased**

69.    On or about December 10, 2024, Plaintiff obtained and reviewed his LexisNexis consumer report dated to December 3, 2024.

70.    Upon his review, Plaintiff discovered that in the "Identification Records" section of the subject consumer report, Defendant reported a death date of March 5, 2004.

71.    Plaintiff further discovered a Capital One inquiry dated to December 2, 2024, demonstrating that this erroneous death date, and thus deceased reporting, was published to Capital One.

72.    Defendant had every reason to know that Plaintiff did not die in March of 2004, including the many credit applications submitted by Plaintiff, the many credit accounts opened, and the many payments made since then.

73.    Out of concern and distress for his credit health and profile, Plaintiff even searched through the Death Master File records to verify if any documentation is causing such an egregiously inaccurate reporting to be furnished to his prospective creditors, but Plaintiff was unable to locate any document evidencing same.

74.    Being unable to fathom the basis of such a reporting, Plaintiff even resorted to the Social Security Administration to ensure that no deceased remark was associated with his social security number.

COMPLAINT AND JURY TRIAL DEMAND

75.    Specifically, on or about December 9, 2024, Plaintiff logged onto the Social Security Administration website to ensure that his social security number was active, and confirmed that it was, with no deceased notation therewith.

76.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the consumer information it published and maintained concerning Plaintiff.

77.    Defendant further violated and Cal Civ. Code § 1785.3(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the consumer information it maintained and published concerning Plaintiff.

78.    As a result of the deceased notation, Defendant made it practically impossible for Plaintiff to continue to obtain credit.

79.    This situation has placed a significant and multifaceted burden on Plaintiff, both financially and personally. The inaccurate credit reporting has aggravated his pre-existing health conditions, manifesting as chronic stress and anxiety, which have, in turn, led to persistent headaches, insomnia, and depression. Furthermore, Plaintiff was compelled to devote substantial time and effort to investigating and addressing these inaccuracies—valuable time that could have been more productively spent fulfilling professional responsibilities or engaging meaningfully with family and friends.

80.    Additionally, the Defendant's erroneous deceased notation severely diminished and entirely undermined Plaintiff's creditworthiness by creating the false

16

COMPLAINT AND JURY TRIAL
DEMAND

impression that fraudulent credit applications were being submitted in Plaintiff's name. This misrepresentation effectively precluded Plaintiff from securing credit from any creditor who relied on such inaccurate reports in evaluating his applications.

81.     Specifically, in addition to the distressing denial by Capital One, Plaintiff submitted a credit application to Bank of America on December 2, 2024, to address his pressing financial needs. However, on that same day, Bank of America promptly denied Plaintiff's credit application as well.

82.     Upon information and belief, Plaintiff's credit application with Bank of America was denied due to the credit report furnished by Defendant, which inaccurately portrayed Plaintiff as deceased.

83.     The inability to secure approval for any of the aforementioned credit applications left Plaintiff unable to address essential financial obligations, resulting in overdue bills and an inability to cover critical expenses, which further deepened his financial hardship.

84.     The erroneous reporting and its resulting financial repercussions subjected Plaintiff to severe financial strain, triggering heightened anxiety, stress, and periods of depression. These emotional and psychological impacts manifested as physical symptoms, including persistent headaches, insomnia, loss of appetite, weight loss, and the aggravation of Plaintiff's pre-existing health conditions.

85.     At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of

COMPLAINT AND JURY TRIAL
DEMAND

their agency or employment, and under the direct supervision and control of the Defendant herein.

86. At all times pertinent hereto, the conduct of Defendant, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

87. Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, the Defendant's violations of the FCRA are willful.

88. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit due to denials, loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating and worthiness; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials, all of which resulted in physical harm to Plaintiff.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

89. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

18

COMPLAINT AND JURY TRIAL DEMAND

90.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure **maximum possible accuracy** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

91.    On at least one occasion, Defendant prepared a patently false consumer report concerning Plaintiff.

92.    Despite actual and implied knowledge that Plaintiff is not dead, Defendant readily sold such a false report to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

93.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports it published and maintained concerning Plaintiff.

94.    As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit due to denials; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating and worthiness; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials, all of which resulted in physical harm to Plaintiff.

COMPLAINT AND JURY TRIAL DEMAND

95.    Defendant's conduct, actions, and inactions was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

96.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## Cal. Civ. Code § 1785.14
## Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

97.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

98.    Defendant is a "consumer reporting agenc[ies]" as defined by Cal. Civ. Code § 1785.3(d).

99.    At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by Cal. Civ. Code § 1785.3(b).

100.    At all times pertinent hereto, the above-mentioned employment report was a "consumer report[s]" as that term is defined by Cal. Civ. Code § 1785.3(c).

101.    Defendant violated Cal. Civ. Code § 1785.14 by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the

COMPLAINT AND JURY TRIAL DEMAND

preparation of the consumer report it sold about Plaintiff especially the information it published within it indicating that Plaintiff was deceased.

102.   As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damage by loss of credit due to denials; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating and worthiness; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials, all of which resulted in physical harm to Plaintiff.

103.   Defendant willfully violated Cal. Civ. Code § 1785.14 in that its conduct, actions, and inactions were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to Cal. Civ. Code § 1785.31(a)(2). Alternatively, Defendant was negligent, entitling Plaintiff to recover under Cal. Civ. Code § 1785.31(a)(1).

104.   Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to Cal. Civ. Code § 1785.31(d), § 1785.31(a)(1) and/or § 1785.31(a)(2).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i.   Determining that Defendant negligently and/or willfully violated the FCRA;

COMPLAINT AND JURY TRIAL
DEMAND

ii.   Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.  Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA;

iv.   Actual damages pursuant to Cal. Civ. Code §§ 1785.31(a)(1) and/or 1785.31(a)(2);

v.    Statutory damages pursuant to Cal. Civ. Code §§ 1785.31(a)(1) and/or 1785.31(a)(2);

vi.   Punitive damages pursuant to Cal. Civ. Code § 1785.31(a)(2);

vii.  Costs and reasonable attorney's fees pursuant to Cal. Civ. Code §1785.31(d);

viii. Punitive damages to be determined at trial, for the sake of example and punishing defendant for its malicious conduct, pursuant to Cal. Civ. Code § 3294;

ix.   Granting further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.


Dated: January 11, 2025          */s/ Andrew J. Gramajo*
                                 Andrew J. Gramajo, CA # 338144
                                 AJG LAW GROUP, PC.
                                 25A Crescent Dr. #402
                                 Pleasant Hill, CA 94523

22

1

2

T:(415) 638-9140
E: Andrew@Ajglawgroup.us

3

4

*Attorneys for Plaintiff
Joseph Albert Lujan*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT AND JURY TRIAL
DEMAND